# UNITED STATES DISTRICT COURT

for the

Middle District of North Carolina

| | |
|---|---|
| In the Matter of the Search of *(Briefly describe the property to be searched or identify the person by name and address)* **Information on Google Drives and all Google Account holdings associated with Alexander Treisman, that is stored at premises controlled by Google, LLC** | ) ) ) ) ) ) Case No. 1:20MJ277-1 |

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

Information on Google Drives and all Google Account holdings associated with accounts held by Alexander Treisman, as further described in Attachment A.

located in the _____ Northern _____ District of _____ California _____ , there is now concealed *(identify the person or describe the property to be seized):*

See Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| U.S.C. § 924(b) | Receipt or transport of a firearm or ammunition in interstate commerce with the intent to commit a felony |
| U.S.C. § 2252A(a)(5)(B) | Receipt and/or possession of child pornography |

The application is based on these facts:

See attached affidavit of FBI Special Agent Christopher McMaster

☑ Continued on the attached sheet.

☐ Delayed notice of _____ days *(give exact ending date if more than 30 days:* _____ *)* is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

/s/Christopher McMaster
*Applicant's signature*

Christopher McMaster, Special Agent, FBI
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by
_____ telephone _____ *(specify reliable electronic means).*

Date: 09/30/2020 8:32a.m.
*Judge's signature*

City and state: Durham, North Carolina
Joe L. Webster, United States Magistrate Judge
*Printed name and title*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

| | |
|---|---|
| IN THE MATTER OF THE SEARCH OF INFORMATION ASSOCIATED WITH ALEXTHEBODACIOUS@GMAIL.COM, ALEX.S.THEISS@GMAIL.COM, GASMERTIME@GMAIL.COM, DOGEBORGER@GMAIL.COM, MOPPYFLOPPER@GMAIL.COM, ASDADSASDASDDASASDSDAA@GMAIL.COM, AND GAMERCLUB9999@GMAIL.COM, THAT IS STORED AT PREMISES CONTROLLED BY GOOGLE, LLC | Case No. 1:20MJ277-1 |

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR A WARRANT TO SEARCH AND SEIZE

I, Christopher McMaster, being first duly sworn, hereby depose and state as follows::

### INTRODUCTION AND AGENT BACKGROUND

1.      1.      I make this affidavit in support of an application for a search warrant for information associated with certain accounts that is stored at premises controlled by Google LLC, an email provider headquartered in Mountain View, CA. The information to be searched is described in the following paragraphs and in Attachment A. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require Google LLC, to disclose to

the government copies of the information (including the content of communications) further described in Section I of Attachment B. Upon receipt of the information described in Section I of Attachment B, government-authorized persons will review that information to locate the items described in Section II of Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation (FBI), and have been since May 2019. I have been assigned to the Joint Terrorism Task Force (JTTF) in the Charlotte Division of the FBI and am primarily responsible for conducting counterterrorism investigations. I have received training in conducting criminal and counterterrorism investigations, searches and seizures, and effecting arrests. I have participated in investigations that involved evidence derived from electronic media and devices.

3.     I have personally participated in the investigation of the offenses discussed below. The facts and information contained in this affidavit are based upon my personal knowledge, information obtained from federal and state law enforcement officers, and information obtained from interviews and analysis of reports. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

2

## JURISDICTION

4.     This Court has jurisdiction to issue the requested warrant because it is "a court of competent jurisdiction" as defined by 18 U.S.C. § 2711.  18 U.S.C. §§ 2703(a), (b)(1)(A), & (c)(1)(A).  Specifically, the Court for the Middle District of North Carolina is "a district court of the United States ...that has jurisdiction over the offense being investigated." 18 U.S.C. § 2711(3)(A)(i).

## DEFINITIONS

7.  The following definitions apply to this Affidavit and Attachment B to this Affidavit:

a.     "Child Pornography" includes any visual depiction of sexually explicit conduct where (a) the production of the visual depiction involved the use of a minor engaged in sexually explicit conduct; (b) the visual depiction was a digital image, computer image, or computer-generated image that is, or is indistinguishable from, that of a minor engaged in sexually explicit conduct; or (c) the visual depiction has been created, adapted, or modified to appear that an

3

identifiable minor is engaged in sexually explicit conduct. See 18 U.S.C. § 2256(8).

b. "Visual depictions" include undeveloped film and videotape, and data stored on computer disk or by electronic means, which is capable of conversion into a visual image. See 18 U.S.C. § 2256(5).

c. "Sexually explicit conduct" refers to actual or simulated (a) sexual intercourse (including genital-genital, oral-genital, or oral-anal), whether between persons of the same or opposite sex; (b) bestiality; (c) masturbation; (d) sadistic or masochistic abuse; or (e) lascivious exhibition of the genitals or pubic areas of any person. See 18 U.S.C. § 2256(2)(A).

d. "Internet Service Providers" or "ISPs" are commercial organizations which provide individuals and businesses access to the Internet. ISPs provide a range of functions for their customers, including access to the Internet, web hosting, e-mail, remote storage, and co-location of computers and other communications equipment. ISPs can offer various means by which to access the Internet including telephone based dial-up, broadband based access via a digital subscriber line (DSL) or cable television, dedicated circuits, or satellite based subscription. ISPs typically charge a fee based upon the type of

4

connection and volume of data, called bandwidth that the connection supports. Many ISPs assign each subscriber an account name such as a user name or screen name, an e-mail address, and an e-mail mailbox, and the subscriber typically creates a password for the account. By using a computer equipped with a telephone or cable modem, the subscriber can establish communication with an ISP over a telephone line or through a cable system, and can access the Internet by using his or her account name and password.

e.     "IP Address" or Internet Protocol address is a unique numeric address used by computers on the Internet. An IP address looks like a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.     "Computer" refers to an electronic, magnetic, optical, electrochemical, or other high speed data processing device performing

5

logical or storage functions, and includes any data storage facility or communications facility directly related to or operating in conjunction with such device. See 18 U.S.C. § 1030(e)(1).

g.     "Storage Medium" means any physical object upon which computer data can be recorded.  Examples include hard disks, RAM, floppy disks, flash memory, CD-ROMs, and other magnetic or optical media.

h.     "Computer hardware" consists of all equipment that can receive, capture, collect, analyze, create, display, convert, store, conceal, or transmit electronic, magnetic, or similar computer impulses or data. Computer hardware includes any data-processing devices (including, but not limited to, central processing units, internal and peripheral storage devices such as fixed disks, external hard drives, floppy disk drives and diskettes, and other memory storage devices); peripheral input/output devices (including, but not limited to, keyboards, printers, video display monitors, and related communications devices such as cables and connections); as well as any devices, mechanisms, or parts

6

that can be used to restrict access to computer hardware (including, but not limited to, physical keys and locks).

i.    "Computer passwords and data security devices" consist of information or items designed to restrict access to or hide computer software, documentation, or data. Data security devices may consist of hardware, software, or other programming code. A password (a string of alpha-numeric characters) usually operates what might be termed a digital key to "unlock" particular data security devices. Data security hardware may include encryption devices, chips, and circuit boards. Data security software of digital code may include programming code that creates "test" keys or "hot" keys, which perform certain pre-set security functions when touched. Data security software or code may also encrypt, compress, hide, or "booby-trap" protected data to make it inaccessible or unusable, as well as reverse the progress to restore it.

j.    "Computer-related documentation" consists of written, recorded, printed, or electronically stored material that explains or illustrates how to configure or use computer hardware, computer software, or other related items.

k.    "Computer software" is digital information that can be interpreted by a computer and any of its related components to direct

7

the way it works. Computer software is stored in electronic, magnetic, or other digital form. It commonly includes programs to run operating systems, applications, and utilities.

l. "The Internet" is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

m. "Records" and "Information" includes all forms of creation or storage, including any form of computer or electronic storage (such as hard disks or other media that can store data); any handmade form (such as writing); any mechanical form (such as printing or typing); and any photographic form (such as microfilm, microfiche, prints, slides, negatives, videotapes, motion pictures, or photocopies).

## PROBABLE CAUSE

5. Based on my training and experience and the facts as set forth in this affidavit, there is probable cause to believe TREISMAN received a firearm with the intent to commit a felony offense, in violation of Title 18, U.S.C. § 924(b), knowingly provided false information in connection with the acquisition of a firearm, in violation of Title 18, U.S.C. § 922(a)(6), and

8

possessed child pornography, in violation of 18 U.S.C. § 2252A(a)(5)(B), (the "Target Offenses").

6.      Specifically, TREISMAN used a false name to purchase a Kel-Tec firearm, and he received and transported firearms and ammunition in interstate commerce with the intent to commit an offense punishable by imprisonment for a term exceeding one year.[1] Additionally, a wireless

---

[1] There is probable cause to believe that information maintained by Discord contain evidence that would show that TREISMAN has planned, discussed and/or intends to carry out a mass shooting or other targeted act of violence, punishable under numerous United States criminal statutes and North Carolina criminal statutes, including but not limited to the following: threats against former Presidents and certain other persons, in violation of 18 U.S. Code § 879; Congressional, Cabinet, and Supreme Court assassination, kidnapping, and assault, in violation of 18 USC 351(c); felonious assault with deadly weapon with intent to kill or inflicting serious bodily injury, a Class C felony, in violation of North Carolina General Statute (NCGS) section 14-32; assault inflicting serious bodily injury, a Class F felony, in violation of NCGS section 14-32.4; murder in the second degree, a Class B1 felony, in violation of NCGS section 14-17(b); and murder in the first degree, a Class A felony, in violation of NCGS section 14-17(a). The act contemplated by TREISMAN is similarly punishable in any state by imprisonment for a term exceeding one year. Further, there is probable cause to believe that evidence related to his unlawful purchase and transportation of firearms is also contained on those devices. inflicting serious bodily injury, a Class C felony, in violation of North Carolina General Statute (NCGS) section 14-32; assault inflicting serious bodily injury, a Class F felony, in violation of NCGS section 14-32.4; murder in the second degree, a Class B1 felony, in violation of NCGS section 14-17(b); and murder in the first degree, a Class A felony, in violation of NCGS section

9

telephone and other electronic storage devices belonging to TREISMAN were reviewed by the FBI pursuant to search warrants and found to contain evidence of child pornography.

7.     Based upon my training and experience, those who possess firearms unlawfully or for an unlawful purpose, often obtain or make statements about the firearms by email or other electronic communications applications by using computers and wireless telephones.  Additionally, those who receive and possess child pornography also do so using email, instant messaging, or other electronic communications by using computers and wireless telephones.

### KANNAPOLIS POLICE DEPARTMENT INVESTIGATION

8.     On May 28, 2020 at approximately 11:00 a.m., KPD officers responded to a report of an abandoned vehicle in the parking lot of the Fifth Third Bank, 606 South Main Street, Kannapolis, North Carolina.  Bank

---

14-17(a). The act contemplated by TREISMAN is similarly punishable in any state by imprisonment for a term exceeding one year. Further, there is probable cause to believe that evidence related to his unlawful purchase and transportation of firearms is also contained on Discord.

10

employees first noticed the vehicle in the parking lot around closing time on May 27, 2020. No one was around the van at the time.

9.     The KPD officers identified the abandoned vehicle as a white Ford E350 van, bearing expired California license plate 8E43177. The officers ran the license plate and obtained an associated Vehicle Identification Number (VIN) but were unable to locate identifying information about the registered owner. Further, the officers were unable to confirm the VIN associated with the license plate matched the VIN on the van because a parking pass covered the VIN plate.

10.     The KPD officers looked through the van windows to determine whether anyone was inside the van and observed an AR-15 style rifle behind the driver's seat; a box for a Taurus .380 handgun laying in the passenger floorboard; a canister of Tannerite[2]; and a box of 5.56 caliber ammunition. Officers then checked the van doors and found the back-right side door was unlocked. Officers opened the van door to determine whether anyone was

_____

[2] Tannerite is a binary explosive often used by target shooters. Tannerite is popular because it produces a loud bang and smoke when hit by a bullet. Tannerite is legal to own and transport in its unmixed form.

11

inside needing help. Officers did not find anyone but observed several gun cases in the back of the van.

11.     The bank branch manager signed a Property Owner Tow Request, asking KPD to tow the van. The KPD officers initiated an inventory search of the vehicle pursuant to KPD policy. The officers found several firearms; books about survival, bomb making, improvised weapons, and Islam; and a large amount of cash banded and sealed in bank bags, estimated to be hundreds of thousands of dollars[3].

12.     The KPD officers terminated the inventory search; towed the van to the KPD secure storage facility; and obtained a state search warrant for the van.  Pursuant to the state search warrant, the officers discovered the following firearms in the van:

    a. Sig Sauer (Sig Sauer Inc, Exeter, NH USA) AR rifle, unknown caliber, unknown model, Serial Number (SN) 20J041880;

---

[3] TREISMAN later told JTTF Investigators the cash was his inheritance from his father. FBI agents confirmed through TREISMAN's mother that he received a sizable inheritance. FBI agents spoke with employees of a bank in Long Beach, California and confirmed TREISMAN withdrew the money in cash on or about January 10, 2020.

12

b. Intratec 9mm Luger, model TEC-DC9, SN D125073;

c. Lower AR receiver – Anderson Manufacturing, model AM-15, multi-caliber, SN 16195421;

d. Kel-Tec Sub-2000, SN FTC43;

e. A rifle marked ArchAngel (possibly a Ruger 10/22 rifle) .22 caliber, SN 259-20969; and

f. Russian Mosin Nagant M91/30, bolt action rifle, 7.62 x 54R (PW Arms Redmond, Washington), Russian SN RMN042789 (6622 on bolt and trigger well).

13.    After the van was towed and KPD officers left, a bank employee again contacted KPD. The employee reported that a white male (later identified as TREISMAN) arrived at the Fifth Third Bank driving a green Honda Accord, pulled into teller drive-through lane #2, and asked about his white van being towed.

14.    KPD officers responded to the bank and encountered TREISMAN waiting in the green Honda in the drive-through teller lane. The officers conducted a stop and ordered TREISMAN out of the Honda. While detained, TREISMAN was asked by officers whether he had anything that would harm

13

them. Later, TREISMAN made a spontaneous utterance in which he advised that there was a gun in the Honda. A Cabarrus County Deputy K-9 handler assessed the Honda with her explosive-trained K-9 and observed the K-9 exhibiting a strong change in behavior when being walked around the front of the car. According to the handler, the strong change in behavior involved the K-9's nostrils flaring, the dog breathing heavy, changing its posture, and wanting to get on top of the hood of the Honda. According to the KPD report, this alert indicated the possibility of explosives, but not necessarily, as the K-9 was trained to sit when there was a positive alert

15. The Cabarrus County bomb squad arrived and examined the Honda to determine whether explosive materials were present. Bomb tech officers used a robot to open the vehicle's door and examine the interior, after which they observed a handgun in the front of the vehicle, near the stereo system. A bomb tech officer donned a bomb suit and continued examining the vehicle. The bomb tech officer located a second handgun in a clothes hamper. The bomb tech officers did not locate any explosive material in the Honda.

16. KPD officers obtained a state search warrant for the Honda and seized the firearms. KPD officers identified the first firearm, found near the stereo system, as a Taurus Spectrum .380 caliber, SN 1F039977. KPD officers identified the second firearm, found inside the clothes hamper, as an Intratec

14

9mm Luger Model AB-10, SN A050018.[4]  They also located TREISMAN's wallet in the cupholder between the seats. In addition to other items, the wallet contained the following, each with a photograph of TREISMAN:

    a. State of Washington Identification Card for Alexander Hillel TREISMAN, with date of birth December 19, 2000;

    b. State of California Driver License, for Alexander Hillel TREISMAN, with date of birth December 19, 2000; and

    c. State of Florida Driver License, for Alexander S. Theiss, with date of birth March 29, 1995.[5]

17.    KPD officers arrested TREISMAN for carrying concealed weapons.  During a search incident to the arrest, KPD officers seized from

---

[4] Dylan Klebold and Eric Harris carried out the shootings at Columbine High School using an Intratec TEC-9, among other weapons. While the TEC-9 is not illegal to own, the firearm is not designed for practical use, such as concealed carry, accurate target shooting, or hunting. JTTF Investigators have not determined TREISMAN purchased his TEC-9s because of their use in the Columbine shootings; however, we note that TREISMAN owns not one, but two of the firearms used in one of the most famous school shootings.

[5] The Florida Driver License displayed a star in the upper right-hand corner purporting to be Real ID compliant. JTTF Investigators contacted the Florida Department of Law Enforcement and learned the Driver License is counterfeit.

TREISMAN a Samsung S9 wireless telephone, uniquely identified by IMEI 353306090607320, and associated with telephone number (206) 293-0658, which had been in his right front pants pocket. The wireless telephone that was seized incident to arrest was the subject of previously obtained federal search warrants and is not included in the Devices that are the subject of this affidavit.

18.     KPD notified FBI agents and Task Force Officers with the FBI Charlotte JTTF (hereafter "JTTF Investigators") of their investigation and the arrest of TREISMAN.

## INITIAL INTERVIEW

19.     JTTF Investigators viewed via closed circuit television an interview of TREISMAN conducted by KPD officers at KPD headquarters. The officers issued *Miranda* warnings and TREISMAN waived his rights and agreed to speak. During that interview, TREISMAN provided his telephone number as (206) 293-0658. KPD officers asked TREISMAN about hand drawings of swastikas, a plane crashing into a building, and destroyed buildings, and the books found in his van. TREISMAN conveyed to the interviewing officers that he had an interest in terrorist incidents and mass shootings, and that he watched YouTube videos and read Wikipedia articles

16

about such incidents. KPD officers also asked TREISMAN about his friends and family. TREISMAN conveyed that many of his friends had recently stopped interacting with him because of remarks and jokes he made in reference to incidents such as mass shootings and the 9/11 terrorist attacks. TREISMAN denied having an intent to harm anyone.

## JTTF INTERVIEW OF ALEXANDER TREISMAN

20. The next day, JTTF Investigators interviewed TREISMAN at the Cabarrus County Jail. Prior to any questioning, the JTTF Investigators presented and reviewed an Advice of Rights form with TREISMAN. TREISMAN agreed to speak to the JTTF Investigators and signed the form, waiving his rights. The JTTF Investigators then explained that lying to federal agents is a crime and showed TREISMAN a copy of 18 U.S.C. § 1001. TREISMAN initialed the copy of the statute indicating he understood. The JTTF Investigators then stated they were not questioning TREISMAN regarding any of the state charges but were concerned only with possible terrorism. TREISMAN indicated he understood.

17

21. The JTTF Investigators asked TREISMAN about international travel. TREISMAN initially denied traveling internationally but later said he traveled to Canada on vacation with his mother.[6]

22. TREISMAN admitted he had an interest in terrorism and reads Wikipedia articles on the subject. He has lost friends because of his joking about incidents such as 9/11.

23. TREISMAN stated that he plays video games, including first-person shooter games, and he plays the video games and talks with people using a computer rather than a gaming console, such as the Sony PlayStation. Additionally, he stated that the gaming community idolizes terrorist attacks, racism, and sexism. TREISMAN denied ever threatening to harm anyone in "the real world."

24. TREISMAN previously lived in Seattle, Washington. He left Seattle and traveled to Long Beach, California, and stayed there for a period of weeks to obtain a driver's license. He said it was easier to obtain a driver

---

[6] A lease agreement in TREISMAN's van indicated he leased an apartment, in or around 2017, in Montreal under the alias Theiss, as found on the counterfeit Florida Driver License. JTTF Investigators have not determined whether TREISMAN used the counterfeit Florida Driver License to lease the apartment.

license in California than in Washington. From California, TREISMAN traveled across the United States to North Carolina over a period of about five days. He stopped in Kansas and purchased two firearms. He stopped in St. Louis, Missouri, and visited someone nicknamed "Gunter." TREISMAN did not know Gunter's true name, and he could not recall Gunter's exact telephone number but provided several digits. He traveled to New Hampshire and purchased a firearm. He stopped in New York City, New York, and visited the 9/11 Memorial. He traveled to West Virginia and purchased another firearm. He then traveled through Virginia into North Carolina. TREISMAN stopped in Fayetteville, North Carolina, and met up with Gunter. TREISMAN and Gunter went to Range 56, an unguarded and unmonitored range, and shot TREISMAN's firearms.

25. JTTF Investigators showed TREISMAN a comment posted to Reddit, in or around the end of February 2020, by user "AlextheBodacious" stating the following:

How do I dox[7] in sub rosa?

_____

[7] Based on my training and experience, I know that to "dox" someone is an Internet-based practice where users search for and publish private

19

I keep dying and being called pedo[8] and want to kill people in real

life about it. How can I find the addresses of those I hate and

execute them for their crimes?

26. TREISMAN said that Sub Rosa was a video game that he played.
Initially, he stated that he could not recall using the online alias
AlextheBodacious or posting the referenced statement above. Later in the
interview, JTTF Investigators again, directly asked TREISMAN if
AlextheBodacious was his Reddit user name. TREISMAN sat back and began
to affirmatively nod, but then stated he could not recall. Later, JTTF
Investigators asked TREISMAN what his intent was in making the
statement on Reddit. Despite claiming repeatedly that he [TREISMAN] could
not recall using the online alias or posting the statement, TREISMAN
replied, "Shock factor."

27. TREISMAN was asked if he used Reddit from his phone or from a
PC (i.e., a personal computer). In response he said he accessed Reddit using

---

information about an individual or organization with malicious intent. This
information can include true name, telephone number, and physical address.

[8] Open source review of dictionary.com for the term "pedo" defines it as a
combining form meaning "child" used in the formation of compound words:
pedophilia. Pedophilia is defined as sexual desire in an adult for a child.

Case 1:20-mj-00277-JLW   Document 1   Filed 09/30/20   Page 21 of 54

a computer, and then he paused and added, "which I no longer have." When asked what happened to the computer, TREISMAN said, "it got shut down" and that "it got like a physical bug, like an actual cockroach, that ate through the power cord." TREISMAN then said he bought a new computer.[9]

28.    TREISMAN prepared a written statement denying an intent to harm anyone and claiming all online threats were part of a persona.

29.    JTTF Investigators then turned the interview to the firearms. JTTF Investigators questioned TREISMAN about the Sig Sauer AR rifle (SN 20J041880). TREISMAN stated he purchased this firearm in New Hampshire through a seller he met on Armslist.com[10]. TREISMAN stated he could not recall if he accessed Armslist via a cell phone or computer. TREISMAN stated he was pretty sure the seller was a resident of New Hampshire. TREISMAN stated he met the seller in a parking lot to purchase the rifle for $800, and it was a 5.56 caliber rifle. TREISMAN stated he could not

———————————————

[9] A damaged power cord, alone, would not render a computer inoperable or irreparable.

[10] Armslist.com is a classified advertisements website, accessible through a web browser, for firearms and firearms accessories. Options on the website allow buyers to search for sellers willing to ship or to sell in person. Not all sellers who use the site are required to have an FFL and identifying the end possessor in those purchases is very difficult.

21

remember the seller's name. TREISMAN stated he was living in a hotel in New Hampshire during the purchase of this firearm. TREISMAN stated he bought this firearm in the past couple of weeks between California and now, which he believed occurred between March 2020, and the present time. TREISMAN stated he also had another upper[11] that he bought as a kit in Seattle.

30.     JTTF Investigators questioned TREISMAN about the Intratec 9 (Model AB-10, SN A050018). TREISMAN stated he bought it in Kansas off Armslist. TREISMAN stated he purchased this firearm loaded, with a round in the chamber, and that he bought it approximately last year or so. TREISMAN did not remember the guy's name he bought it from.

31.     JTTF Investigators questioned TREISMAN about the Kel-Tec Sub-2000 (SN FTC43). TREISMAN originally stated he bought this firearm

---

[11] Per Title 27, Code of Federal Regulations, section 478.11, a firearm frame or receiver is "[t]hat part of a firearm which provides housing for the hammer, bolt or breechblock, and firing mechanism, and which is usually threaded at its forward portion to receive the barrel." Some firearms are constructed with receiver assemblies, which are split into an upper assembly and a lower assembly, each housing different components. JTTF Investigators determined TREISMAN possessed two upper assemblies, or "receivers," and two lower assemblies, or "receivers," in his van.

in Kansas, and then corrected himself that he purchased this firearm from a home-based Federal Firearms Licensee (FFL) in Seattle, Washington. TREISMAN told agents he bought some other guns in Kansas, but not this one. TREISMAN told agents he bought this firearm off Armslist, but through an FFL. TREISMAN stated, "I did a background check and everything and came back clear, so." JTTF Investigators asked TREISMAN what identification he used to purchase the firearm. TREISMAN responded, "I don't recall." JTTF Investigators asked TREISMAN if he used the Florida Driver License. TREISMAN responded, "No, not that I recall." JTTF Investigators told TREISMAN that the FFL had a copy of TREISMAN's counterfeit Florida Driver License and asked TREISMAN why he had a different story than the FFL. TREISMAN told agents that he wasn't saying that, he was just saying that he could not recall. JTTF Investigators had obtained, prior to their interview of TREISMAN, a photocopy of the ATF Form 4473 related to the purchase of the Kel-Tec Sub 2000 from an FFL in Snoqualmie, Washington. The ATF Form 4473 lists the purchaser as "Alexander NMN Theiss" with the date of birth of March 29, 1995. The name Alexander Theiss, with the date of birth March 29, 1995, is consistent with the false identification found in TREISMAN's wallet on May 28, 2020.

23

32.     JTTF Investigators questioned TREISMAN about the Taurus Spectrum pistol (SN 1F039977). TREISMAN stated he bought this firearm within the past couple of weeks in West Virginia from a seller he met on Armslist. TREISMAN stated he thought it was brand new because the seller sold it to him in the box with the manual for $200. TREISMAN told agents he could not remember the seller's name or handle from Armslist.

## ADDITIONAL ONLINE INVESTIGATION

33.     JTTF Investigators conducted online searches for the online aliases used by TREISMAN, and located a comment posted "1 year ago" to Reddit by user AlextheBodacious, believed to be TREISMAN:

Toolhead, more like narcissistic bitch who cant take an insult and would die in the gaids of 25

First post in 6 months

But leme tell you FUCK toolhead!!! I hate him!!

He dishes it out but he cant take it, I call him a mouse furry and a wagie cuck virgin and he bans me from his minecraft server! Im shook! **I want to do a school shooting!** What do I do, /b/?

[emphasis added]

24

34.     JTTF Investigators also uncovered an iFunny[12] account used by user AlextheBodacious, believed to be TREISMAN, where he posted a screenshot of a statement made by the Fraternal Order of Police regarding the death of Brianna Taylor with the following comments with user Hitchhiker00 on April 8, 2020:

Hitchhiker00: It is quite possible the Molotov brigade is taking notes...

AlextheBodacious: gonna hold a coup?

Hitchhiker00: this is going to happen sooner or later, not a coup but the citizens will fight back when they cant stand it any more. If history is a guide. its coming.

AlextheBodacious: well I am

Hitchhiker00: Remember one thing. in a decision like this. you must be willing to sacrifice your life for justice. If you cannot do that, you aren't ready.

---

[12] iFunny is a type of social media platform that has both a website and a mobile application, on which users can post internet memes. A meme is typically a humorous image, video, or piece of text that is copied and spread by internet users. An iFunny user typically has a page on which that user can post memes

25

AlextheBodacious: I was going to do a columbine for a while. I think it would be better to put it towards something more memorable

Hitchhiker00: Don't harm the innocent. If you want to be remembered PROTECT the innocent. Turn your anger towards murders and those who understand it.

AlextheBodacious: my hatred is for the complacent American people who will turn u in for their own satisfaction. But aside from former goals, my eyes are on the future. If anything I have to save bernie[13] while I can.

35.     JTTF Investigators also uncovered an image posted on iFunny on April 15, 2020 by user AlextheBodacious with the text, "should I kill joe biden?" Analysis of returns received as a result of legal process served to Chase Bank and Sprint Corporation for financial transaction and cell site location data for TREISMAN's bank card and phone revealed TREISMAN was in Wilmington, Delaware on May 3, 2020 and, on at least one occasion,

---

[13] Based off a review of TREISMAN's internet search history, online posts, and online comments, "bernie" is believed to be Vermont Senator Bernie Sanders. Sanders dropped out of the 2020 Presidential race on April 8, 2020.

26

was within four miles of Joe Biden's residence at 1209 Barley Mill Rd Wilmington, Delaware.

## FBI INTERVIEW OF SHAWN ADAMS

36.     JTTF Investigators conducted commercial database searches on TREISMAN's last known address in Seattle, Washington, and identified Shawn Adams, a resident of St. Louis, Missouri, as a possible associate. The name "Shawn Adams" appears on a Green Dot prepaid Visa card that was located in TREISMAN's wallet. Adams's telephone number substantially matched the telephone number for Gunter provided by TREISMAN.

37.     Investigators from the St. Louis Division of the FBI interviewed Adams on May 30, 2020. Adams described TREISMAN as an outcast that seemed to be driving around the country. Adams remained in contact with TREISMAN even though he felt "put off" by TREISMAN's far right racist comments and an apparent interest in mass shootings. TREISMAN made many comments about "hating niggers" and talked of killing African Americans. TREISMAN spoke about mass shootings in a positive way and seemed interested in past known school shooters such as those at Columbine.

38.     During the interview, Adams accessed his personal cellular telephone and provided contact information, tag names, and other

27

information associated with TREISMAN. Adams communicated with TREISMAN with the following contact numbers and vanity names: phone contact "Alex the Exterminator" at (206) 293-0658; and "Alex the Bodacious" on the Steam gaming website.[14]

39. Adams told the agents that he first met TREISMAN in person on March 31, 2020, when TREISMAN paid for him [Adams] to fly to Los Angeles, California. They spent a few days driving around California and just hanging out. TREISMAN was strange and made comments about shooting homeless people. At one point, TREISMAN referred to shooting the homeless as "taking out the trash." Adams noted that TREISMAN was extremely interested in mass shootings.

40. While in Hollywood, California, Adams and TREISMAN were hiking up a trail to the Hollywood sign that overlooks the city. TREISMAN said, "Forty percent of murders go unsolved." Adams became more uncomfortable and "put off" by TREISMAN. At one point during the trip, TREISMAN went to his apartment to retrieve a 9mm handgun that he

---

[14] Telephone number (206) 293-0658 is associated with the wireless phone seized by KPD incident to TREISMAN's arrest. The Steam gaming user name of "Alex the Bodacious" is the same user name referenced above in association with the Reddit account of "AlextheBodacious."

28

carried with him on the hike to the Hollywood sign. TREISMAN told Adams that he [TREISMAN] would have definitely done a school shooting in Seattle if he [TREISMAN] would not have left the city. TREISMAN did not give specifics of a plan to carry out the threat.

41. In April 2020, Adams and TREISMAN went to an open-air gun range somewhere near Fayetteville, North Carolina. Adams recalled seeing three guns in TREISMAN's possession. They fired the three guns while at the range. Adams described the guns as follows: an AR-style rifle .223; an AR-style rifle with collapsible stock; and a 9mm handgun with Ruger magazines. While TREISMAN was firing his weapons, he would call out the names of well-known mass shooters, such as the Columbine shooters, as he pulled the trigger. Adams tried to distance himself from TREISMAN after this trip. TREISMAN was too "right wing" and racist.

42. Adams showed the interviewing agents his recent cellular text messages with TREISMAN. Adams described one recent text message that he [Adams] received from TREISMAN's phone (206) 293-0658,[15] on May 25, 2020. TREISMAN's message said, "epic school shooting". Adams described

---

[15] Telephone number (206) 293-0658 is associated with the wireless phone seized by KPD incident to TREISMAN's arrest.

this as a typical message that TREISMAN would send talking about school shootings in a positive way.

## FBI SEARCH OF TREISMAN'S PHONE

43.    On June 3, 2020, based on the forgoing information, the FBI obtained a federal search and seizure warrant from the Honorable Joe L. Webster, Magistrate Judge, U.S. District Court for the Middle District of North Carolina, to forensically examine and search TREISMAN's Samsung S9 wireless telephone, IMEI 353306090607320, associated with telephone number (206) 293-0658[16] ("TREISMAN's phone"), for records related to violations of Title 18 U.S.C. Section 924(b); that is receiving and transporting firearms and ammunition in interstate commerce with the intent to commit a felony offense and  18 U.S.C.  U.S.C. § 922(a)(6) Knowingly providing false information in the acquisition of a firearm.  The warrant was served the same day and the device was transported to the FBI Charlotte Field Office in the Western District of North Carolina.

---

[16] IMEI 353306090607320 and telephone number (206) 293-0658 are associated with the wireless phone seized by KPD incident to TREISMAN's arrest.

44.     On June 3, 2020, subsequent to the transport of TREISMAN's phone to the FBI Charlotte Field Office, JTTF Investigators began examining the content of the device, pursuant to the federal search warrant. As a result, the JTTF Investigators uncovered numerous videos and files, to include videos of the New Zealand Mosque shooting, online searches from April 4, 2020 to April 30, 2020 for "sam woodward[17]," "background checks required for public sales," and a downloaded file from armslist.com titled "Fayetteville-north-carolina-shotguns-for-sale-trade". The device also contained a video recorded on April 23, 2020 of an airplane at an airport behind a chain-link fence, where TREISMAN is heard saying, "Now I'm not saying you should, I'm just saying you could, hypothetically, cut right through the chain link fence and make your way right onto that airplane right there. Hijack it and fly it into a building. Now should you? No. But admittedly that would be fucking awesome, and if you can you definitely shou-, um, well, well yeah."

45.     JTTF Investigators also uncovered multiple online searches from TREISMAN's phone that occurred from April 17, 2020 to May 17, 2020 for

---

[17] Sam Woodward, in 2018, murdered a 19-year-old in Orange County, California, stabbing him 20 times. Woodward was a member of the neo-Nazi group Atomwaffen

"joe biden," "joe biden house," "1209 barley mill rd wilmington[18]," and "does the vp get secret service for life".

46.     Additional evidentiary items obtained from TREISMAN's phone is a "Note" stored in the phone on or about October 15, 2019, which displays the following text:

> That being said, the satisfaction of it justifies anything else. I hate crikens and normies and karens so much it makes it worth it to go through with it. So heres my plan: on christmas or black friday, go to the mall food court with worktunes (great bass), a respirator (if teargas is used) and a weapon of choice (i like the ab-10, its concealable and comes with a 30 rounder by default, though everyone chooses the ar15, im not saying its normie, just overused).

47.     Regarding "the ab-10" as "a weapon of choice" in the "plan" quoted above, KPD officers found an Intratec 9mm Luger Model AB-10, SN A050018, in a clothes hamper, in the Honda driven by TREISMAN when he was encountered at the Fifth Third Bank in Kannapolis, North Carolina on

---

[18] 1209 Barley Mill Rd Wilmington, Delaware is a publicly known residence for Joe Biden.

May 28, 2020. Additionally, TREISMAN stated in an interview with JTTF Investigators the next day that he bought the AB-10 in Kansas off Armslist. TREISMAN stated he purchased this firearm loaded, with a round in the chamber, and that he bought it approximately last year or so.

48.    An additional search of TREISMAN's phone conducted by FBI Violent Crimes Against Children Investigators on June 4, 2020 pursuit to a federal search warrant that  identified hundreds of images and videos appearing to be sexually explicit images of minors, evidence of violation of Title 18 U.S.C. § 2252A(a)(5)(B), possession of child pornography.

## FBI SEARCH OF TREISMAN'S OTHER DEVICES

49.    On July 13, 2020, the FBI obtained a federal search and seizure warrant from the Honorable Joi Elizabeth Peake, Magistrate Judge, U.S. District Court for the Middle District of North Carolina, to forensically examine and search TREISMAN's electronic data storage media, including computers, a wireless telephone, a camera, hard drives, USB drives, and SD memory cards for material related to violations of 18 U.S.C. § 2252A. On June 17, 2020, a search of the Lenovo IdeaPad 320 laptop computer by the Charlotte FBI Violent Crimes Against Children Investigators identified potential material relating to violations of Title 18, U.S.C. § 924(b) and requested the material be reviewed by Charlotte FBI JTTF Investigators.

33

50.    A review of the material revealed a screenshot taken on May 16, 2020 of a note written in Notepad[19]. The note was a list that contained the following:

fridge

field

    go out and see things you wouldn't see from google maps. What kind of gate is there?

Routes

instances

    think of every scenario

d

get everything set up

execute

---

[19] Notepad is an application that comes preloaded on most computers and laptops that run the Microsoft Windows operating system. The application allows for a user to type and save text.

51.     JTTF Investigators determined the observed image was consistent with a surveillance and attack plan connected to a possible threat against Joe Biden or other targeted act of violence and was evidence of a violation of Title U.S.C. § 924(b) and was consistent with other evidentiary items discovered during the course of the investigation.

52.     During the search of the Seagate Pipeline 500 GB hard dive, JTTF Investigators uncovered a document appearing to have been authored by TREISMAN, titled "A Guide to Mass Shooting," which contained an opening paragraph and the outline of three chapters: Reasoning, Preparation, and Showdown.

53.     Additionally, JTTF Investigators discovered a Google Chrome browser file on the Seagate Pipeline 500 GB hard drive that showed TREISMAN  viewed the website https://fakeidvenders.com/assets/js/jquery.scrollTo.min.js[20].

---

[20] Fakeidvenders.com is a website that connects individuals interested in obtaining fake identification with individuals who produce fake identification. There is also a message forum to discuss topics relating to fake identification.

54.     Violent Crimes Against Children Investigators discovered 1248 videos and 6721 images consistent with the statutory definition of child pornography found on nine of TREISMAN's electronic devices.

## ATTRIBUTION OF EMAILS

55.     The email, Alex.S.Theiss@gmail.com, was discovered on a rental agreement for an apartment in Quebec, Canada with the name of Alex Theiss, a known alias of TREISMAN, as the person leasing the apartment. The rental agreement was found during KPD's search of TREISMAN's van. Legal process returns from Armlist.com show TREISMAN used Alex.S.Theiss@gmail.com account to register for a Armslist.com account and began using the account on 5/21/2018. TREISMAN used Armslist.com to acquire multiple guns found in his possession, including a Kel-Tec Sub 2000 purchased using a fake Florida driver's license under the alias Alex Theiss on 6/7/2018.

56.     The email, gasmertime@gmail.com, was discovered on TREISMAN's Seagate Pipeline 500 GB hard drive. A screenshot found on the hard drive from 01/01/2020 showed an open web browser that contained an image consistent with the definition of child pornography with web address jwzzevnbrietxx7e4nqmfv73mre7rjok6nktidduppjcei6xr75aybyd.onion/SPAM/res/14904.html. In my training and experience, I know this address is

36

consistent with a dark web address accessed through TOR[21]. The screenshot also revealed another tab open on the browser for the email inbox of "gasmerti...," which FBI investigators believe is gasmertime@gmail.com. In my training and experience, I know individuals who view or possess child pornography may save those images and distribute them using email accounts or other electronic communication applications.

57.     The email, gasmertime@gmail.com, was also discovered in an achieved Gmail file on TREISMAN's Seagate Pipeline 500 GB hard drive indicating he used the email address to register for an additional account with Discord.

58.     The email, alexthebodacious@gmail.com, was discovered on an application for U.S. Post Office Box service agreement bearing the name Alexander H. TREISMAN found during KPD's search of TREISMAN's van. Alexthebodacious@gmail.com was also listed as TREISMAN's email on his current U.S Passport.

---

[21] TOR, which stands for "The Onion Router," is a free and open-source software for enabling anonymous communication accomplished through encryption and various IP address routing techniques. Use of TOR or similar onion router software is often required to access the dark web.

59.    Legal process returns from Armlist.com show TREISMAN also maintained an account using alexthebodacious@gmail.com last used on 5/12/2020.

60.    Forensic analysis of TREISMAN's ZTE Cell phone by FBI investigators found one image consistent with the statutory definition of child pornography with a file path showing it was downloaded to the phone on 12/14/2018 and uploaded to a Google drive associated with alexthebodiacious@gmail.com on 1/10/2018. A file path associated with the image also shows the image was uploaded to floppymopper@gmail.com on an unknown date.

61.    Legal process returns for TREISMAN's known Discord account showed a listed email address of alexthebodacious@gmail.com registered on 11/12/2017.

62.    An interview with an online associate of TREISMAN revealed TREISMAN was active on Discord and used Discord user name's Flippy Mapper, Thanos Car, and Mikey Kosterello. He/she also knew TREISMAN used the user names Alex Theiss, Alex the Bodacious, and Alex T for other applications and email accounts. He/she had seen videos and screen captures of TREISMAN attempting to upload child pornography onto Discord. He/she also saw pictures of an AR-15 and Tec-9 posted by TREISMAN on Discord.

38

He/she also observed several outbursts by TREISMAN in Discord where TREISMAN would say, "What if I just shot up a Wal-Mart?" or a similar violent phrase on several occasions.

63. An interview with an additional online associate of TREISMAN who played Sub Rosa and was active on Discord stated TREISMAN had been banned multiple times from Discord channels, but would rejoin using different accounts. I know that in order to create a Discord account, a user must provide a unique email address that is not linked to an existing account. JTTF investigators believe TREISMAN used multiple email address to create multiple Discord accounts.

64. During the review of the Seagate Pipeline 500 GB hard drive, a Chrome browser file linked to Gmail containing the file information "MergedPersonSourceOp" was found with the Gmail accounts gasmertime@gmail.com, dogeborger@gmail.com, moppyflopper@gmail.com, asdadsasdasddasasdsdaa@gmail.com, and gamerclub9999@gmail.com. Based off my training and experience, I know it is possible to link multiple Google accounts all used by the same user, which allows files and information to be moved from one account to another.

65. For the violation of 18 U.S.C. § 924 (b) and 18 U.S.C. § 922(a)(6), it is reasonable to believe that messages or transactions regarding weapons

purchases or false identification could be on the previously referenced accounts from 5/21/2018 to the date of TREISMAN's arrest on 5/28/2020.

66.     For the violation of 18 U.S.C. § 2252A(a)(5)(B), it is reasonable to believe that child pornography was sent, received, or otherwise stored on the previously referenced accounts from 1/10/2018 to the date of TREISMAN's arrest on 5/28/2020.

### BACKGROUND CONCERNING GOOGLE ACCOUNT SERVICES

67.     In my training and experience, I have learned that Google LLC provides a variety of on-line services, including electronic mail ("email") access, voice, online chatting, and messaging to the public. Google LLC's online messaging app is known as "Google Hangouts," and is a message exchange platform which allows the sharing of messages, images and video. It is available on the internet and as a mobile application.  Images, communication, and video are stored in Google Hangouts and can be shared privately with other users having Google accounts.  In essence, Google Hangouts provides a platform for individuals to communicate with each other.

68.     Google Photos is a photo sharing and storage service developed by Google and is available both on the internet via website and as a mobile application.  Google Photos gives users free unlimited storage space for

40

photos and videos, under certain conditions, described below. Google Photos can be configured to sync photos and videos taken with a user's camera to a user's Google Photo account

69. I know from research and testing that Google Hangouts, Google Drive and Google Photos are complementary parts of the same Google services account that are all associated with a Google Account. Photos and videos are stored on a user's Google account's storage space with each account having 15 gigabytes (GB) of free storage, with the option to purchase additional storage space. Files uploaded to a user's Google account via Google Drive count against the 15 GB quota. Files uploaded via Google Photos do NOT count against the account's quota as long as they are uploaded as "High Quality" (Google's term). Google advertises that images/videos uploaded as "High Quality" get an unlimited amount of storage space. Images/videos uploaded in "Original Quality" (Google's term) DO count against the account's quota. The difference between "High Quality" and "Original Quality" has to do with the amount of compression applied to a file, which affects the file's size.

70. I know from knowledge and experience that, by default, the Google Photos mobile application is configured to automatically transfer and store graphics files created on the mobile device to the Google Photos service

associated with the Google account. Users also have the option to manually transfer files between Google Photos and Google Drive.

71.     Google LLC allows subscribers to obtain email accounts and Google Drive storage space at the domain name @GMAIL.COM, like the email accounts listed in Attachment A. Subscribers obtain an account by registering with Google LLC. During the registration process, Google LLC asks subscribers to provide basic personal information. Therefore, the computers of Google LLC are likely to contain stored electronic communications (including retrieved and unretrieved email for Google LLC subscribers) and information concerning subscribers and their use of Google LLC services, such as account access information, email transaction information, and account application information. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

72.     In general, files that are transferred to a Google Drive or Google Photos account are stored in the subscriber's storage space on Google LLC servers until the subscriber deletes the data. If the subscriber does not delete files, they can remain on Google LLC servers indefinitely. Even if the

42

subscriber deletes files, they may continue to be available on Google LLC's servers for a certain period of time.

73.    A Google LLC subscriber can also store with the provider files in addition to emails, such as address books, contact or buddy lists, calendar data, pictures, notes (other than ones attached to emails), and other files, on servers maintained and/or owned by Google LLC. In my training and experience, evidence of who was using an email account may be found in address books, contact or buddy lists, email in the account, and attachments to emails, including pictures and files.

74.    In my training and experience, email providers generally ask their subscribers to provide certain personal identifying information when registering for an email account. Such information can include the subscriber's full name, physical address, telephone numbers and other identifiers, alternative email addresses, and, for paying subscribers, means and source of payment (including any credit or bank account number). In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users. Based on my training and my experience, I know

43

that, even if subscribers insert false information to conceal their identity, this information often provides clues to their identity, location, or illicit activities.

75.     In my training and experience, email providers typically retain certain transactional information about the creation and use of each account on their systems. This information can include the date on which the account was created, the length of service, records of log-in (i.e., session) times and durations, the types of service utilized, the status of the account (including whether the account is inactive or closed), the methods used to connect to the account (such as logging into the account via the provider's website), and other log files that reflect usage of the account. In addition, email providers often have records of the Internet Protocol address ("IP address") used to register the account and the IP addresses associated with particular logins to the account. Because every device that connects to the Internet must use an IP address, IP address information can help to identify which computers or other devices were used to access the email account.

76.     In my training and experience, in some cases, email account users will communicate directly with an email service provider about issues relating to the account, such as technical problems, billing inquiries, or complaints from other users. Email providers typically retain records about such communications, including records of contacts between the user and the

44

provider's support services, as well as records of any actions taken by the provider or user as a result of the communications. In my training and experience, such information may constitute evidence of the crimes under investigation because the information can be used to identify the account's user or users.

77. As explained herein, information stored in connection with an email account may provide crucial evidence of the "who, what, why, when, where, and how" of the criminal conduct under investigation, thus enabling the United States to establish and prove each element or alternatively, to exclude the innocent from further suspicion. In my training and experience, the information stored in connection with an email account can indicate who has used or controlled the account. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence. For example, email communications, contacts lists, and images sent (and the data associated with the foregoing, such as date and time) may indicate who used or controlled the account at a relevant time. Further, information maintained by the email provider can show how and when the account was accessed or used. For example, as described below, email providers typically log the Internet Protocol (IP) addresses from which users access the email account, along with the time and date of that access.

By determining the physical location associated with the logged IP addresses, investigators can understand the chronological and geographic context of the email account access and use relating to the crime under investigation. This geographic and timeline information may tend to either inculpate or exculpate the account owner. Additionally, information stored at the user's account may further indicate the geographic location of the account user at a particular time (e.g., location information integrated into an image or video sent via email). Last, stored electronic data may provide relevant insight into the email account owner's state of mind as it relates to the offense under investigation. For example, information in the email account may indicate the owner's motive and intent to commit a crime (e.g., communications relating to the crime), or consciousness of guilt (e.g., deleting communications in an effort to conceal them from law enforcement).

## CONCLUSION

78.      Based on my training and experience, and the facts as set forth in this affidavit, there is probable cause to believe TREISMAN received and transported firearms and ammunition in interstate commerce with the intent to commit an offense, punishable by imprisonment for a term exceeding one year, in violation of Title 18, United States Code, Section 924(b), knowingly provided false information in connection with the acquisition of a firearm, in

46

violation of Title 18, United States Code, Section 922(a)(6), and possessed

child pornography, in violation of 18 United States Code § 2252A(a)(5)(B).

Additionally, a wireless telephone and other electronic storage devices

belonging to TREISMAN were reviewed by the FBI pursuant to search

warrants and found to contain evidence of child pornography. Likewise, as

above set out, the email accounts above are linked to TREISMAN and/or his

devices and likely contain evidence of the aforementioned statutory

violations.

79.     Based on my training and experience, and the facts as set forth in

this affidavit, there is probable cause to believe that the Account described in

Attachment A contain additional evidence, as detailed in Attachment B, of

the Target Offenses.

80.     I submit that this affidavit supports probable cause for a search

warrant authorizing the examination of the Account described in Attachment

A to seek the items described in Attachment B.


                              Respectfully submitted,


                              /S/ Christopher McMaster
                              Christopher McMaster
                              Special Agent
                              Federal Bureau of Investigation

47

In accordance with Rule 4.1(b)(2)(A), the Affiant attested under oath to the contents of this Affidavit, which was submitted to me by reliable electronic means, on this <u>30th</u> day of September, 2020, at 8:32a.m.

_____

JOE L. WEBSTER
UNITED STATES MAGISTRATE JUDGE
MIDDLE DISTRICT OF NORTH CAROLINA

48

## ATTACHMENT A

This warrant applies to information associated with Google Drive and all

Google Account holdings associated with

ALEXTHEBODACIOUS@GMAIL.COM, ALEX.S.THEISS@GMAIL.COM,

GASMERTIME@GMAIL.COM, DOGEBORGER@GMAIL.COM,

MOPPYFLOPPER@GMAIL.COM,

ASDADSASDASDDASASDSDAA@GMAIL.COM, AND

GAMERCLUB9999@GMAIL.COM that are stored at premises owned,

maintained, controlled, or operated by Google LLC a company headquartered

in Mountain View, CA.

_____

# ATTACHMENT B

## I.      Information to be disclosed by Google LLC (the "Provider")

To the extent that the information described in Attachment A is within the possession, custody, or control of the Provider, regardless of whether such information is located within or outside of the United States, and including any emails, records, files, logs, notes, or information that has been deleted but is still available to the Provider, for the period of time from 12/11/2017 to 5/28/2020 the Provider is required to disclose the following information to the government for each account or identifier listed in Attachment A:

a.      The contents of all electronic data and instant messages stored in the accounts, including copies of electronic data and instant messages sent to and from the account, draft e-mails and instant messages, the source and destination addresses associated with each electronic data and/or instant message, the date and time at which each electronic data/instant message was sent, and the size and length of each electronic data/instant message;

b.      Any deleted e-mails or instant messages, including any information described in subparagraph "a," above;

2

c.     All records or other information regarding the identification of the account, to include full name, physical address, telephone numbers and other identifiers, records of session times and durations, the date on which the account was created, the length of service, the IP address used to register the account, log-in IP addresses associated with session times and dates, account status, alternative email addresses provided during registration, methods of connecting, log files, and means and source of payment (including any credit or bank account number);

d.     The types of service utilized;

e.     All records or other information stored by an individual using the account, including address books, contact and buddy lists, calendar data, pictures, notes, and files; and

f.     All records pertaining to communications between the Provider and any person regarding the account, including contacts with support services and records of actions taken.

## II.     Information to be seized by the government

All information described above in Section I that constitutes fruits, evidence and instrumentalities of violations of 18 U.S.C. §§ 924(b), 18 U.S.C. §§ 922(a)(6), and 18 U.S.C. §§ 2423(b), including, for each account or

3

identifier listed on Attachment A, information pertaining to the following matters:

a.     All images depicting children engaging in sexually explicit conduct as defined in 18 U.S.C. § 2423(b)

b.     All electronic communications regarding children engaging in sexually explicit conduct;

c.     All communications with potential minors involving sexual topics or in an effort to seduce the minor.

d.     Any evidence that would tend to identify the person using the account when any of the items listed in subparagraphs a-c were sent, read, copied or downloaded.

e.     Records relating to who created, used, or communicated with the account or identifier, including records about their identities and whereabouts.

f.     Records related to firearm and ammunition purchases and sales.

g.     Records related to the acquisition of any firearms, ammunition, explosives, tactical gear, or any other weapon or equipment to conduct assaults, mass shootings, murders, or terrorist attacks.

4

h.      Communications and any other records relating to assaults, communicated threats, mass shootings, murders, and terrorist attacks, or the planning thereof.

i.      Records regarding any use of or obtaining fraudulent identification.

j.      Records related to firearms- or tactical-training.

k.      Records related to social media and gaming platform usage, including user names and buddy lists.

5